1 Good morning, Your Honors, excuse me. May it please the court, Ron Keto with the Montgomery, excuse me, Ron Keto with the Gordon Arata Montgomery Barnett Law Firm for the appellants, Roll Schmidt, Transformers, and the Subrogated Underwriters. I'm respectfully reserving five minutes for rebuttal. This appeal is from the United States District Court for the Eastern District of Louisiana and is about whether the appellees can avoid being bound by their own contracts with respect to the shipment at issue. The issue on appeal, or issues on appeal, are whether the District Court erred in relying on U.S. Supreme Court cases Kirby and Kahlon in granting motion for summary judgment under the facts of this case, and whether the District Court erred in finding that there were no entitlement to summary judgment as a matter of law. Just a few pertinent facts to the argument. The Transformers at issue were damaged during a multimodal shipment from the Port of Rotterdam to an energy substation located in St. Gabriel. Roll Schmidt had previously sold the Transformers to Entergy and contracted with Central Oceans to arrange transportation services to the substation. Central Oceans, in turn, made arrangements with the appellees, which consists of an ocean carrier, a rail carrier, and a trucker, to provide those services. Unlike Kirby and Kahlon, Onego, the ocean carrier, issued a bill of lading for the ocean carriage of the Transformers from Rotterdam to New Orleans. Central Oceans, Illinois Central, issued waybills for the transport of the Transformers from the Port of New Orleans to a spur line near the Entergy substation. BR Transportation, the trucker, issued a contract for the movement of the Transformers from the spur line to the Entergy substation. Importantly, after the lawsuit was filed, the appellees affirmatively pled their own contracts in their response to pleadings. For instance, BR, at ROA 63, pled that Central Oceans, for itself and on behalf of Roll Schmidt, entered into a contract dated November 15, 2015, with BR Transportation to move and install the Transformers. BR attached a copy of the contract to its answer and pled that it was entitled to all defenses and conditions in it. Central Oceans, for its part, pled its contract and tariff at ROA 147, and Onego pled the terms of its bill of lading at ROA 151 through 52. Onego also subsequently filed a motion to dismiss pursuant to a foreign selection clause in that bill of lading. Despite their own contracts, they filed a motion for summary judgment based upon a covenant not to supervision of Central Oceans through bill of lading. The appellants are not trying to upset the apple cart with respect to Kirby and Kalon. Those two cases clearly establish that when a through bill of lading governs an international multimodal shipment, the performing carriers can benefit from its terms and conditions, including limitation of liability, through a Himalayan clause in that bill of lading. However, unlike this case, Kirby and Kalon did not involve instances where the performing carriers issued their own contracts for the individual segments of the overall multimodal shipment. If Central Oceans' bill of lading was the only contract with respect to the transport of this cargo, we very likely would not be here today because the facts would fall squarely within Kirby and Kalon. But that is not the case. In this case, the appellees issued their own contracts pertaining to their specific segments of the multimodal shipment. That is a distinguishing fact which renders Kirby and Kalon non-dispositive. We also cited a brief, a case in our briefs, ZP Transport, which is cited in our briefs, in which an intermediate carrier transported cargo from Chicago to Miami. The cargo was stolen en route and litigation ensued. The intermediate carrier filed a motion for summary judgment, seeking the benefit of a thruway bill issued by the originating carrier. The intermediate carrier relied on Kirby and Kalon. The district court ruled that Kirby and Kalon were distinguishable because they only involved thruway bills of lading. In the Northern District of Illinois case, the intermediary carrier issued his own bill of lading and was bound to those terms. The same rationale should apply here. The appellees issued their own contracts to govern their respective shipments and pled them as such. Under the facts of this case, Kirby and Kalon should not be controlling and the appellants should not be allowed to avoid the contractual consequences of their own contracts. The rules establishing Kirby and Kalon were applied too broadly, in my opinion, by the district court under the facts of this case and its judgment should be reversed. The district court also erred in finding that the appellees had met their burden of proof that there were no genuine issues of material fact concerning which contracts or contracts governed the relationship between the parties and whether Roll-Schmidt had agreed to the covenant not to supervision. In addition to submitting the appellees' individual contracts in Roll-Schmidt's opposition, Roll-Schmidt also submitted its contract with Central Oceans. In that contract, Roll-Schmidt did not agree to release any party, including the foreign carriers or Central Oceans, from any liability for damage to its cargo while in transit to the introduced substation. The district court also ignored the uncontroverted declaration of Roll-Schmidt's procurement manager, who stated that Roll-Schmidt did not agree to be bound by any terms and conditions barring it from seeking recovery for damages sustained to its transformers from any party involved in their ship. In addition, and more importantly, the evidence before the district court demonstrated that Central Oceans did not accept exclusive liability or the fault of its subcontractors for the damage to the cargoes. When Central Oceans was presented with this claim by Roll-Schmidt, Central Oceans denied liability and told Roll-Schmidt to pursue its claims against the performing carriers, the appellees, which is what Roll-Schmidt did. Based upon the record before the district court, there were issues of material fact which recluded summary judgment. As a result, the case was not right, and district court's judgment should be reversed. Also, the district court ruled that the Onego— And what would happen on reversal, in your view? Does it go back to the district court for proceedings? Yes, sir. It should go back to the district court, and the contracts between the appellees and Central Oceans and Roll-Schmidt should be evaluated and enforced. Will there be additional fact findings, or does the district judge just look at all the contracts? I think there may need to be some additional facts discovered. We were placed on sort of an accelerated discovery plan with respect to this issue. We had, as I recall, about three weeks to exchange written discovery on this issue, and so I think that perhaps additional fact finding may be necessary. Can't you fully recover from Central Oceans? Why do you need these defendants? Because Central Oceans denied exclusive liability. Central Oceans denied the liability of the performing carriers. Had Central Oceans accepted the liability, it would be a different story. Why don't you sue them and see what the court says? Roll-Schmidt sued Central Oceans, and they were included in this lawsuit. What happened? Central Oceans filed a motion to transfer Venue to Virginia based upon its bill of lading with issue to Roll-Schmidt. The court ultimately transferred, severed claims against Central Oceans and transferred the case against Central Oceans to Virginia. During that process, the Appellees opposed that motion to transfer, arguing that they were not signatories, they were not bound by the Central Oceans bill of lading. Yet, a few weeks later, they filed a motion for summary judgment on the same bill seeking the benefit of the covenant not to sue provision. In Virginia? In New Orleans. Right. They're back here, but Central Oceans is still in Virginia. Yes. What's the status of that suit? I was getting ready to mention that. That case is settled. So you got money from them? Yes. Central Oceans did pay to settle that claim. The contract between Central Oceans and Roll-Schmidt was subject to a package limitation. The contracts issued by the Appellees may or may not be subject to a package limitation. Beard's contract does not have a limitation of liability, as I recall. And I don't recall Illinois Central having a limitation of liability either in its proposal and terms and conditions. So what percentage did you receive from Central Oceans of the claim that you're looking for these to be paid to? The overall damages to the cargo are estimated at about $1.8 million. That's your claim? The claim is about $1.8 million. What was recovered from Central Oceans in the Virginia case was 2 percent, 3 percent. It was negligible. Why? Because of the package limitation? Because of the limitation. Okay. Mr. Kitto, you saved time for rebuttal, of course. Yes, sir.  Mr. Messer. Thank you, Your Honor. Your Honor, John Messer on behalf of Ocean Carrier, the actual carrier, Onego Shipping. This case is a straightforward application of a multimodal contract. We have exactly what this bill of lading was designed to do. This is a standard in the industry form, a BIMCO form, the multi-DOC 95 form. There's no changes to it. It's designed to cover this exact situation where you have international travel over the ocean, over the rails, and over the roads. That is what these contracts are designed to do. Clause 15B, which is the Himalaya clause in this particular case, is designed to streamline the maritime commerce by providing the merchant, in this case Royal, with a single cause of action against a single defendant, in that case the multi-transport operator, the NVOCC, Central Oceans, and give them one chance to collect against that party. If they don't like the limitation of liability, the package limit that's contained in the bill of lading, they're able to negotiate with that MTO, that NVOCC, to remove that term. Assuming they had a fair opportunity to declare and all the standard rules that are required under the law, they can negotiate the package limit if they're not happy with it. Before shipment? Before shipment. That's correct, Your Honor. What they cannot do is then come after and try to go down the line when there's a Himalaya clause that prohibits them from doing so. In this case, Will doesn't really contest that the central bill of lading is a through bill of lading. It also doesn't contest that, if applicable, the through bill's Himalaya clause prohibits the instant suit against the Appellees. Finally, it admits that the Appellees, all of us, are servants of the multimodal contractor. They are the actual carriers of the transformer cargo. They are the intended beneficiaries of the Himalaya clause. So they're reduced to arguing what they do in this case is, one, we didn't expressly agree to the terms and conditions of the bill of lading, and then, two, that because each of the subcarriers, the subcontractors, issued their own transportation documents, that somehow eliminates the ability of these subcontractors to claim the benefits of the Himalaya clause. And, frankly, both arguments fail under the applicable jurisprudence. The Supreme Court looked at this exact same issue in the context of a rail carrier in the Kirby case. In that case, we had two bills of lading were issued, one by the NVOCC, and then one by the ocean carrier. In that case, the only difference, the ocean carrier hired the rail carrier as opposed to the NVOCC, in this particular case, hiring the rail carrier and the trucking company directly. In that case, they allowed the rail carrier to take advantage of both bills of lading's Himalaya clause. They were able to take advantage of the NVOCC's Himalaya clause, which provided a limitation of liability, and then the ocean carrier, Hamburg, sued. Their particular bill of lading provided an even lower limitation of liability, and the rail carrier was also able to take advantage of that. So what Kirby established was that the right of a subcarrier is to seek protection under any bill of lading that is applicable to it. In this case, because Royal sued under the bill of lading issued by Central Oceans, references explicitly in its complaint under Mitsui v. Mira MV, this honorable court has held that once you sue on the bill of lading, a cargo plaintiff takes that bill of lading and accepts those terms. They're bound by those terms. They can't avoid it by relying on a catch-all phrase that it was also suing under other contracts for the freight men or other contracts. They expressly sued under the bill and is bound by it. Moreover, as Your Honor was pointing out, when they opposed the motion to transfer, what they didn't do is contend that the Central Oceans bill of lading did not govern this litigation. They waived the argument that that bill of lading is no longer the governing bill of lading. What the Supreme Court did in Kline is set out an overarching point that in multimodal commerce, you've got to have one governing contract, and that's the through bill of lading. It produces certainty to everybody. It helps with the uniformity demands of maritime law, and it provides predictability. Any holder in due course of that bill is going to know, okay, if I have a claim, I'm going to have to sue the issuing carrier, the NVOCC, and then those people have to go after the individual subcontractors. It makes it a lot easier for the cargo plaintiff that they don't have to chase after a foreign defendant such as the ocean carrier or a foreign other United States defendant like the rail carrier. They can just go to that NVOCC, the one that they chose, the one they contracted with, and they can collect from them and leave it up to the NVOCC to chase after the subcontractors that they hired. That way, whoever makes the decision to enter into that contract bears the consequences of that contract. Now, the argument that the subcontracts issued by the various actual carriers, perhaps in this case somehow the booking note and non-negotiable bill issued by Onego, the customer proposal and internal way bills issued by Illinois Central, or the bid proposal of Burrard, the trucking company, that these somehow prevent the applicability of a separate overarching bill of lading simply somehow prevents them from claiming the protections of the Himalaya Clause, it doesn't make any sense, and it's inconsistent with the Supreme Court's findings. The Supreme Court allowed those Himalaya Clauses. The NVOCC in this case particularly said, I am entering into this agreement on behalf of my servants, and to treat each of the multiple stages of a multimodal transport as a separate liability regime and a separate contract eliminates what the Supreme Court was trying to do in Kirby and Kline and put in a uniform, comprehensive liability scheme. When there's substantial maritime commerce, as there is in this case, COGSA applies, unless otherwise contracted, and they're going to enforce those limitations and the Himalaya Clauses. In this case, Central's bill of lading noted that in Clause 1, it applies irrespective of whether there is another unimodal or multimodal contract involving one or several modes of transport. Clause 10, Central agreed to assume the responsibility of the acts of omissions of its contractors as if it were their own, and so consistently, and third, with that, they drafted Clause 15B, which says, hey, since I've taken on the responsibility of the servants, you can't sue my servants. Clause 15 relieves all of Central's servants, the actual carriers, Onego, Illinois Central, and Burrard, from a liability to Royal. They still have liability to Central under the terms and conditions of their respective subcontracts with Central, but it is not up to Royal to assert those remedies. Royal's remedy is unaffected. COGSA liability is intact. They just can only go after the issuing carrier of the bill of lading. Thank you, Your Honor. All right. Thank you, Mr. Professor. Mr. Berry? Yes, Your Honors. Frank Berry of Deutsche Kerrigan on behalf of Appelli Burrard Transportation Company, a small company in south Louisiana. I think that the most significant admission from the appellant is the fact that appellant has not disputed that the Central Oceans Bill of Lading is a through bill of lading, and Judge Afric, in the opinion below, stated that it was uncontested in the case that the Central Oceans Bill of Lading is the through bill of lading, and that means we trigger the decisions of the Supreme Court in Kaline and Kirby because both Kaline and Kirby pointed out that multimodal transportation has evolved over many years now, and due to technological advances, the industry itself came up with this idea of having a through bill of lading issued a lot of times by NVOCCs, non-vessel operating common carriers. And as a matter of fact, Judge Smith referred to the public policy reasons in a prior case back in 2000. It didn't have anything to do with a limitation of liability or exoneration from liability, as this case did, but it did refer to the whole NVOCC industry, and that was the Mannesman case versus MV Concert Express. It was in 2000 in the Fifth Circuit. It was 225F3, 587 at pages 588 and 589, in which Judge Smith referred to how this whole industry has developed this answer to what to do with multimodal transportation. And so therefore, we submit that it's an open and shut case that you should follow Kirby and Kaline and not strain to find some sort of exception or loophole or outlier instance that would take this case out of a simple application of Kaline and Kirby. In regard to Burrard, Burrard executed a contract only with Central Oceans. It did not issue any piece of paper to Royal Smith at all. It sent to Central Oceans a proposal dated October in 2015, which was then signed and returned by Central Oceans in November 2015 after Royal Smith had issued its purchase order to Central Oceans. So we did not issue any piece of paper to Royal Smith. We do not have privity of contract with Royal Smith. We rely on the through bill of lading controlling the relationship of Royal Smith to us. Royal Smith still has its right to recovery. I was not aware of the fact that it had already settled the Virginia case. Royal Smith has its right of recovery against the through bill of lading issuer, and apparently it has settled that case. As Judge Afric pointed out below, what Royal Smith has now is it has its recovery from the person it went to to handle all of this multimodal transportation, and it agreed to the limitation of liability in that contract per COGS of package limitations. So now the only thing that remains, as pointed out by Judge Afric in his opinion below, is the fact that Central Oceans can come and try to get indemnity from any one of these three appellees. But, of course, that case would only be in regard to what Central Oceans paid Royal Smith to settle the case. Which is a mere 2%. Which is probably $500 per package or something. How much more is fees in this room than the potential recovery? Yeah, there would be a minimal potential recovery on the indemnity claim by Central Oceans against us because it's probably limited on, if not by package, then it's limited by poundage. You said it was a package limitation? Yeah. They got 2% of 1.8 million. So, as Judge Afric pointed out, that was what he realized after he granted us summary judgment in regard to Royal Smith. He said if Royal Smith hits the home run and recovers against Central Oceans, Central Oceans always still has its indemnity claim. They can come back here and come after the appellees. But this points out exactly how the industry and the Supreme Court has evolved a solution to all of these contractual problems, is you use a through bill of lading. Thank you, Mr. Berry. Mr. Nelson? Good morning, Your Honors. Brad Bellson on behalf of Illinois Central. I don't want to belabor the facts that you've already heard. Illinois Central, specific to Illinois Central, there was a mention of some internal documents. Those were not bills of lading issued to Royal Smith as a customer. We had, much like Burrard, a contract issued to Central Oceans. There was a way bill that was attached to the summary judgment. That was an internal transportation document. That wasn't even used external to the railroad. That simply told our transportation crews how to move or where to move the rail car. This case, as you heard, there is no real reason here to carve out a K-line or a Kirby exception. There just isn't. When Royal Smith admitted that the bill issued was a through bill, which they did in response to the summary judgments, it removed really the only factual dispute that the district court had to contemplate because at that point it became undisputed that we had a through bill, and under Kirby and K-line subsequent bills are essentially irrelevant at that point. There is a recollection, or at least there is a reliance on this ZP transport case. There it was clear there wasn't a through bill. You had an airway bill that covered the transport from Seoul, Korea to Chicago, and then a subsequent domestic way bill, bill of lading that was issued. So that's not the issue you have here. You have one consistent through admitted, excuse me, admitted through bill covering point of origin in Rotterdam all the way to destination in St. Gabriel, Louisiana. There just really wasn't anything other than fact-finding or anything along those lines that the court had to grapple with once the admission was made. Have the transporting defendants performed any discovery to determine who actually caused the damage to the cargo? There was, at least initially produced by the insurance companies and the plaintiffs, a report of a claims adjustment essentially. But Illinois Central did not participate in that. In fact, we weren't even aware that this damage had occurred until the lawsuit was filed. Who did they say caused the damage? There was an argument in the report that you essentially had excessive vibration or some issue that happened with a flat-spotted rail car wheel. And the support for that was that a prior instance for this manufacturer or this plaintiff, they found that a rail car had a flat-spotted rail and you had similar damage. They couldn't even claim here that there was specific evidence of a rail car flat-spotted wheel. But you're the target at this point. If you take just that claims report, then the Illinois Central would be the target for the damage. However, as I said, we would take great issue with the admissibility of such speculation. You just haven't started that discovery. We didn't get to that portion of the case because the judge recognized the through bill and its Himalaya clause preventing any lawsuit against the subcontractors. Essentially, that would be a Central Oceans argument. Central Oceans would then have to come in and argue about who is essentially liable to it for some damage caused on one of the three legs of our involvement in the case. Okay. All right. Thank you, Mr. Bellson. Thank you. Mr. Kitto, you've saved time for a vote. Your Honor, if the appellees are allowed to avoid the consequences of their own contracts, in this case, under the facts of this case, what happens next time when there is no covenant not to sue in the through bill of lading? They're going to be arguing that their individual contracts issued govern because they want the limitation liabilities or terms and conditions that may apply from those contracts. So I think the analysis needs to be a little bit more involved. You just can't say, here's Kirby, here's K-Line, here's the through bill of lading, we win. That's what they want to do. And I don't think that's good for the principle of uniformity of maritime law. But that would require carving out an exception to Kirby and K-Line, right? Well, not necessarily an exception, but I think that we have to look at the individual contracts. They issued three contracts. They treated this shipment not as an intermodal shipment. They treated it as individual segments. They issued their own contracts for those segments. They were the performing carriers. Onego's bill of lading is from departure in Rotterdam, delivery in New Orleans. Illinois Central, New Orleans to St. Gabriel. B-Yard, its contract pertains to the movement from the spur line at St. Gabriel to the energy substation. They want to have that cake and eat it too. They want to issue their own terms and conditions, plead them, but yet seek the benefit of another contract. And I understand Kirby and K-Line. I understand the principles behind them. But I think under the facts of this case, we need to dig a little bit deeper. And for those reasons, I think the district court's judgment should be reversed. Thank you. Thank you, Mr. Kiddo. Your case and all of today's cases are under submission. The court is in recess.